# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF PATRICIA A. WATLAND by ERIC WATLAND, Personal Representative,

       Plaintiff-Appellant/Cross-Appellee,

v

ALI J. MANNS, R.N., DEARBORN SURGERY CENTER, L.L.C., doing business as DEARBORN SURGERY CENTER, KELLY MORSE, R.N., MARC J. MILIA, M.D., MICHIGAN ORTHOPEDIC SPECIALISTS, and MICHIGAN BONE AND JOINT SOUTHSHORE,

       Defendants-Appellees/Cross-Appellants.

UNPUBLISHED
December 26, 2017

No. 331563
Wayne Circuit Court
LC No. 13-005798-NH

Before: MURRAY, P.J., and K. F. KELLY and FORT HOOD, JJ.

PER CURIAM.

In this medical malpractice action, plaintiff appeals by right an order reflecting the jury's verdict of "no cause of action" as to any of the defendants. Finding no errors warranting reversal, we affirm.[1]

## I. BASIC FACTS

The decedent, Patricia Watland (Patricia), died two days following arthroscopic knee surgery to repair a torn meniscus. Her estate ("plaintiff") brought a medical malpractice action against a number of defendants, including the surgeon who performed the surgery, Marc J. Milia, M.D. (Milia), as well as the Dearborn Surgery Center ("surgery center" or "DSC") where the surgery took place, and Ali J. Manns, R.N. (Manns), a nurse who spoke with Patricia the day after her surgery.[2]

---

[1] Given the fact that we are affirming the judgment, we decline to address defendants' cross appeals, which are only relevant if the matter had been remanded.

[2] There are a number of defendants named in the suit, but these three were the focus at trial and are the focus on appeal.

-1-

Patricia died as a result of a pulmonary embolism (PE) most likely brought on by a deep vein thrombosis (DVT). Plaintiff alleged that Milia was negligent for failing to recognize that Patricia had a number of risk factors making her more susceptible to DVT and that Milia could have taken a number of prophylactic steps – both before and after the surgery – to prevent the DVT. Plaintiff alleged that Manns was negligent in failing to direct Patricia to the emergency room after learning that Patricia had a swollen foot and a cold calf. Manns had called Patricia the day after her surgery to see how she was doing and plaintiff alleged that Manns failed to recognize the seriousness of the situation. In addition to the hotly debated standard of care testimony, a major issue at trial was whether a post-operative call sheet was a "medical record." There was no dispute that, after learning that Patricia had died, Manns went back and added information to the call sheet. Specifically, Manns added that she told Patricia that if her symptoms got worse or did not improve, she should call her doctor or take herself to the emergency room. Following the evidence, the jury returned a verdict of no cause of action against any of the defendants.

## II. ROBERT HINES'S TESTIMONY

Plaintiff argues that the trial court erred when it struck portions of testimony of its causation expert, Dr. Robert Hines. Conceding that Hines was a causation expert, plaintiff nevertheless alleges that defendants "opened the door" to standard of care testimony and that the trial court erred when it precluded plaintiff from asking follow-up questions on re-direct.

"[T]he qualification of a witness as an expert and the admissibility of the testimony of the witness are in the trial court's discretion and we will not reverse on appeal absent an abuse of that discretion. An abuse of discretion exists if the decision results in an outcome outside the range of principled outcomes." *Surman v Surman*, 277 Mich App 287, 304–305; 745 NW2d 802 (2007).

In order for a medical malpractice plaintiff to prevail, she must prove a number of elements:

In order to establish a cause of action for medical malpractice, a plaintiff must establish four elements: (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care. [*Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004).]

Proximate cause involves both the "cause in fact" and the "legal cause." *Skinner v Square D Co*, 445 Mich 153, 162-63; 516 NW2d 475 (1994). The first requires a showing that "but for" defendants' action, plaintiff would not have been injured whereas the latter focuses on foreseeability and whether a defendant should be held legally responsible for such consequences. *Id.* "A plaintiff must adequately establish cause in fact in order for legal cause or 'proximate cause' to become a relevant issue." *Id.*

Hines testified only as to the "cause in fact" of Patricia's death. He explained how a PE is formed and how it can be fatal. All of the parties agree that Hines was a causation expert and was not offered to testify regarding standard of care. In fact, under MCL 600.2169(1)(a), he was not qualified to offer standard of care testimony. "[I]f a defendant physician is a specialist, the plaintiff's expert witness must have specialized in the same specialty as the defendant physician at the time of the alleged malpractice." *Woodard v Custer*, 476 Mich 545, 560–61; 719 NW2d 842 (2006).

Plaintiff argues that although Hines was not qualified to offer an opinion as to the standard of care, defense counsel "opened the door" to such questions during cross-examination when defense counsel questioned Hines about whether a PE can occur even in the absence of negligence. Because Hines's deposition was played for the jury in lieu of his testimony at trial, the parties and the trial court were able to discuss and exclude the evidence prior to its presentation. Defense counsel had questioned Hines about whether it was possible to have a PE in the absence of negligence:

*Q.* And you have seen those pulmonary emboli come from a good many things; you've seen them come about as a result of surgery?

*A.* Yes.

*Q.* You have seen them come about as a result of surgeries, where they were done by the finest [surgeon] in the Akron area where you practiced or in Baltimore where you trained, and the patient still got an embolism?

*A.* That can happen, certainly.

*Q.* You have seen it develop in patients who appear to be in very good health, but they grew an embolism?

*A.* Yes, that can happen.

*Q.* You have seen patients who were, particularly on this . . . I-75 corridor, patients who are on those trips to or from Florida, after sitting in those cars for periods of time?

*A.* Yes. It's I-71.

*Q.* It's I-71 but you know what I'm talking about.

*A.* Yes.

*Q.* And people regrettably, unfortunately people get sick from those, from just sitting in the car?

*A.* It can happen.

*Q.* It does happen. You have seen it happen to people who just got off the airplane?

*A.* Yes.

*Q.* And wind up in your hospital and your ICU?

*A.* Yes.

*Q.* From sitting for four or five hours?

*A.* Yes.

*Q.* Is, what does the term "phenomena" mean when used in medicine?

*A.* Something that happened.

*Q.* It's something that happens?

*A.* Something that happens.

*Q.* And again, with medicine, because of the misfortune of the facts that you, as well as you are, have controlled everything, I think you may not be aware of this, because you never testified in Michigan, but the jury is going to get an instruction from the Judge in this case that there are inherent risks in medicine that are beyond the physician's control. Do you agree with that? Do you agree with that? That there are inherent risks in medicine?

*A.* Yes, I would agree with that.

\* \* \*

*Q.* Okay. And sometimes, again, seeing what you've seen, particularly seeing what you have seen as a critical care physician and as an internist, situations develop but do not reflect the fact that care was given based on doctor's training and the doctor's experience and you can still get a bad outcome; you see that weekly, don't you?

*A.* You mean if the care was fine?

*Q.* Yes.

*A.* But you have a bad outcome?

*Q.* Yes.

*A.* Yes, that can happen.

*Q.* Okay. It's like ten people who still get diabetes or who's never smoked who still get lung cancer?

*A.* Yes.

The trial court sustained defense counsel's objection to the following exchange during re-direct examination:

REDIRECT EXAMINATION

BY MR. HAFELI:

*Q.* I have a few follow-up questions. Doctor, do you have an opinion as to whether this case, this Patricia Watland case was the case of a bad outcome, where the physician and nurse performed proper care?

MR. COPELAND: Objection. That is standard of practice, and he is not qualified to offer an expression as to whether or not the care given was standard of practice.

MR. GALBRAITH: Join.

MR. HAFELI: You opened the door and just asked that question.

MR. COPELAND: I didn't open the door.

MR. HAFELI: Yes, you did. You just asked him. So I will take an answer.

THE WITNESS: Yes, I have an opinion.

BY MR. HAFELI:

*Q.* What is your opinion?

*A.* I believe, in my opinion, that this is not a matter of proper care being given and a bad outcome. I believe that the outcome was preventable with better care.

Plaintiff complains that the jury was deprived of Hines's opinion that this was *not* a case in which a bad result came about in the absence of negligence. It cites to a number of cases in which otherwise inadmissible evidence may be admitted and pursued where the opposing party "opens the door" or makes it an issue in the case. However, defense counsel did not open the door to otherwise inadmissible standard of care testimony. Instead, defense counsel merely asked Hines whether it was possible to have a bad result in the absence of negligence, which touches on the standard jury instruction for "medical uncertainty":

> There are risks inherent in medical treatment that are not within a doctor's control. A doctor is not liable merely because of an adverse result. However, a doctor is liable if the doctor is negligent and that negligence is a proximate cause of an adverse result. [M Civ JI 30.04 Medical Malpractice: Cautionary Instruction on Medical Uncertainties.]

Defense counsel's questioning did not touch upon what a reasonable orthopedic surgeon would have done, but whether a bad medical outcome can result in the absence of negligence. As such, the door was not opened for plaintiff's attorney to question Hines about whether Milia had, in fact, breached the standard of care.

Moreover, contrary to plaintiff's argument, the jury was not deprived of Hines's opinion regarding the effect of Milia's actions on Patricia's death. Prior to the above exchanges, plaintiff's counsel had questioned Hines:

*Q.* In the record, it's revealed that following the surgery, Dr. Milia didn't give any type of anti-coagulant shot to Mrs. Watland and he didn't use sequential compression

-5-

pumps during the surgery and he didn't use compression stockings during the surgery. Do you have an opinion whether Dr. Milia's actions with regard to those three things I just mentioned, whether his failure to take those three steps was a proximate cause of Mrs. Watland's death within a reasonable degree of medical certainty?

     *A*. Yes I have an opinion.

     *Q*. Okay.

     *A*. That opinion is that yes, that was a causation factor. Had those measures been taken, there is a definite possibility, more likely than not, that a blood clot would not have formed and that she subsequently would not have suffered a pulmonary emboli.

     *Q*. All right. Is that opinion within a reasonable degree of medical certainty?

     *A*. Yes.

Therefore, contrary to plaintiff's contention, the jury heard that the outcome in this case may have been preventable.[3]

The trial court did not abuse its discretion when it struck Hines's standard of care testimony because he was not qualified to offer an opinion regarding Milia's treatment. Defense counsel did not open the door to such testimony by simply asking Hines whether a pulmonary embolism may result in the absence of negligence. In any event, the jury heard Hines's testimony that Patricia's pulmonary embolism may have been avoidable.

## III.  INSTRUCTIONAL ERROR

Claims of instructional error are generally reviewed de novo.  *Cox v Bd of Hosp Managers for City of Flint*, 467 Mich 1, 8; 651 NW2d 356 (2002).  However, a trial court's determination whether a standard instruction was applicable and accurate is reviewed for an abuse of discretion.  *Moore v Detroit Entertainment, LLC*, 279 Mich App 195, 223; 755 NW2d 686 (2008).  Additionally, "when the standard jury instructions do not adequately cover an area and a party requests a supplemental instruction, the trial court is obligated to give the instruction if it properly informs the jury of the applicable law and is supported by the evidence."  *Silberstein v Pro-Golf of Am, Inc*, 278 Mich App 446, 451; 750 NW2d 615 (2008).  That decision, is likewise "within the trial court's discretion."  *Id*.

### A.  THE JURY'S REQUEST FOR EVIDENCE

Plaintiff argues that the trial court violated MCR 2.513(P) when it refused the jury's request for a copy of Hines's testimony.

A trial court's decision whether to provide evidence that the jury requested during deliberations is reviewed for an abuse of discretion.  *People v Howe*, 392 Mich 670, 677; 221 NW2d 350 (1974).

---

[3] In fact, this exchange forms the basis for defendants' cross-appeal.

MCR 2.513(P) provides:

> If, after beginning deliberation, the jury requests a review of certain testimony or evidence that has not been allowed into the jury room under subrule (O), the court must exercise its discretion to ensure fairness and to refuse unreasonable requests, but it may not refuse a reasonable request. The court may make a video or audio recording of witness testimony, or prepare an immediate transcript of such testimony, and such tape or transcript, or other testimony or evidence, may be made available to the jury for its consideration. The court may order the jury to deliberate further without the requested review, as long as the possibility of having the testimony or evidence reviewed at a later time is not foreclosed.

Plaintiff argues that the trial court violated MCR 2.513(P) when it "refused" to provide Hines's testimony. However, plaintiff starts with the false premise that the trial court "refused" to provide the jurors Hines's testimony. The trial court did not refuse anything. Instead, upon realizing that it had provided an incomplete instruction under M Civ JI 4.11[4], the trial court decided to re-instruct the jury and allow it to make future requests, if needed. These actions did nothing to foreclose a subsequent request for Hines's testimony. In the context of criminal law, our Supreme Court has noted that there are logistical problems associated with requests for transcripts and that the key inquiry is whether an instruction impermissibly forecloses to the jury the possibility of later reviewing the requested testimony. In so doing, the Court acknowledged that such requests call upon a trial court to exercise discretion:

> While it is true that trial transcripts often are not prepared until well after trial, we caution against instructing the jury in this manner as such instruction forecloses to the jury the possibility of later reviewing the requested testimony, e.g., by having the court reporter read back the testimony, and consequently, violates the court rule. However, we also note that, given that the jury made the request for the testimony of four witnesses only fifteen minutes into deliberations, the trial court could have properly refused the request and instructed the jury to continue deliberating had it done so in a manner which did not foreclose the possibility of having the testimony reviewed at a later time. [*People v Carter*, 462 Mich 206, 214 n 10; 612 NW2d 144, 148 (2000).]

Here, it is clear that the trial court's instruction complied with the court rule as it did not foreclose the opportunity to review the testimony at a later time.

### B. STANDARD JURY INSTRUCTION 12.01

Plaintiff argues that the trial court erred when it refused to instruct the jury on M Civ JI 12.01.

Jury instructions "should include all the elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them." *Zaremba Equipment, Inc v Harco Nat'l Ins Co*, 280 Mich App 16, 26; 761 NW2d 151 (2008). MCR 2.512(D)(2) provides:

---

[4] That deposition testimony should be treated the same as testimony at trial.

Pertinent portions of the instructions approved by the Committee on Model Civil Jury Instructions or the Committee on Model Criminal Jury Instructions or a predecessor committee must be given in each action in which jury instructions are given if

(a) they are applicable,

(b) they accurately state the applicable law, and

(c) they are requested by a party.

However, "it is error to instruct a jury about an issue unsustained by the evidence or the pleadings." *Murdock v Higgins*, 454 Mich 46, 59; 559 NW2d 639 (1997).

M Civ JI 12.01 provides:

We have a state statute which provides that [here quote or paraphrase the applicable part of the statute as construed by the courts].

If you find that the [defendant / plaintiff] violated this statute before or at the time of the occurrence, you may infer that the [defendant / plaintiff] was negligent. (You must then decide whether such negligence was a proximate cause of the occurrence.) [M Civ JI 12.01 Violation of Statute—Negligence.]

The footnote to the instruction provides, in relevant part:

This instruction should be given only if defendant or plaintiff has alleged a statutory violation as a ground for negligence, and only if –

the statute is intended to protect against the result of the violation;

the plaintiff is within the class intended to be protected by the statute; and

the evidence will support a finding that the violation was a proximate contributing cause of the occurrence. [M Civ JI 12.01, n a1.]

The statute plaintiff's attorney believed that Manns violated was MCL 750.492a, a criminal statute that provides, in part:

(1) Except as otherwise provided in subsection (3), a health care provider or other person, knowing that the information is misleading or inaccurate, shall not intentionally, willfully, or recklessly place or direct another to place in a patient's medical record or chart misleading or inaccurate information regarding the diagnosis, treatment, or cause of a patient's condition. A violation of this subsection is punishable as follows:

The trial court did not abuse its discretion when it declined to instruct the jury on M Civ JI 12.01. According to the footnote, the instruction should only be given if plaintiff has alleged a statutory violation *as a ground for negligence* and violating the statute was *a proximate cause* of Patricia's death. Plaintiff alleges that Manns was negligent in failing to direct Patricia to an emergency room upon

hearing her symptoms, instead telling Patricia to elevate the leg. Manns's documentation of the conversation (or her addition/alteration) did not cause Patricia's death. At most, the addition might reflect a "consciousness of guilt", which plaintiff pursued at length during trial. This is simply not a situation for which the jury instruction was intended. Instead, it is better applied to scenarios such as traffic accidents where one driver's moving violation may allow the jury to infer that the driver was negligent.

Even when there is instructional error, reversal is not required unless failure to do was would be inconsistent with substantial justice. MCR 2.613(A). "[T]here is no error requiring reversal if, on balance, the theories of the parties and the applicable law were adequately and fairly presented to the jury." *Murdock*, 454 Mich at 59. "Reversal is not warranted when an instructional error does not affect the outcome of the trial." *Jimkoski v Shupe*, 282 Mich App 1, 9; 763 NW2d 1 (2008). It cannot be said that the trial court's decision not to instruct the jury on M Civ JI 12.01 had any impact on the outcome of the trial. Plaintiff spent an inordinate amount of time at trial trying to show that Manns had altered the record for some nefarious purpose. But, again, the "alteration" of Patricia's medical record (if it was so) had no bearing on the proximate cause of her death. Manns's alleged negligence was in failing to instruct Patricia to go to the hospital upon hearing her symptoms. Her notation on the call sheet had no bearing on whether her advice was negligent.

## C. SPECIAL JURY INSTRUCTION

Plaintiff argues that the trial court erred when it refused to give plaintiff's proposed special jury instruction regarding Manns's alteration of the medical record.

Plaintiff proposed the following special instruction, based on New Jersey's Standard Civil Jury Instruction 5.50H:

### Alteration of Medical Records

Nurses have a duty to ensure that all treatment records accurately reflect the treatment or services rendered. Corrections or changes to entries may be made only where the change is clearly identified as such, dated and initialed by the person making the change. In fact, it is against the law in this State to alter medical records with the intent to deceive or mislead anyone.

In this case you have heard evidence that Defendant, Ali J. Manns, R.N., came back and added the following language to the Postoperative Follow-Up Call sheet: " . . .**if worsens or 0 improvement call DR or -. ER.**"

The alteration of medical records is admissible as evidence of a defendant's own belief that the actual records do not support her defense. If you find that Defendant, Ali J. Manns, R.N., altered the medical records with the intent to deceive or mislead anyone, you may infer that the alteration of the records in this case occurred because Defendant, Ali J. Manns, R.N. believed that the original record would have been unfavorable in the trial of this matter.

The trial court did not abuse its discretion in declining to give plaintiff's requested special jury instruction. Michigan does not have a standard instruction similar to New Jersey's, but it does have an

instruction that allows for a negative inference when evidence has been destroyed. M Civ JI 6.01(a) provides:

> (The [plaintiff / defendant] in this case has not offered [the testimony of [*name*] / [*identify exhibit*]]. As this evidence was under the control of the [plaintiff / defendant] and could have been produced by [him / her], and no reasonable excuse for the [plaintiff's / defendant's] failure to produce the evidence was given, you may infer that the evidence would have been adverse to the [plaintiff / defendant].) [M Civ JI 6.01 Failure to Produce Evidence or a Witness.]

The instruction entitles the jury to draw an adverse inference only when "(1) the evidence was under the party's control and could have been produced; (2) the party lacks a reasonable excuse for its failure to produce the evidence; and (3) the evidence is material, not merely cumulative, and not equally available to the other party." *Ward v Consolidated Rail Corp,* 472 Mich 77, 85-86; 693 NW2d 366 (2005). "It is well settled that missing evidence gives rise to an adverse presumption only when the complaining party can establish intentional conduct indicating fraud and a desire to destroy evidence and thereby suppress the truth." *Id.* at 84.

No evidence was lost or destroyed. Manns readily admitted that she made additions to the call sheet. The sheet itself remained intact and available for analysis. It was not thrown away, shredded, suppressed or destroyed. The original call sheet was intact and made available to plaintiff's handwriting experts.

## D. DEADLOCKED JURY INSTRUCTION

Plaintiff's arguments are two-fold. It first argues that the trial court erred in failing to read the jury's question into the record and inviting the attorneys to respond. It then argues that the trial court erred in failing to comply with the "Notes on Use" in M Civ JI 60.02.

Regarding the first of these two arguments, MCR 2.513(N)(2) provides, in relevant part:

> If questions arise, the court and the parties shall convene, in the courtroom or by other agreed-upon means. The question shall be read into the record, and the attorneys shall offer comments on an appropriate response. The court may, in its discretion, provide the jury with a specific response to the jury's question, but the court shall respond to all questions asked, even if the response consists of a directive for the jury to continue its deliberations.

There is no support for plaintiff's contention that the trial court failed to comply with the court rule. A review of the record reveals that although the trial court did not read the jury's "question" verbatim, it clearly informed the parties that the jury had indicated it was at an impasse. The trial court also clearly invited the attorneys' comments on how to respond.

Ultimately, the trial court instructed the jury:

> The Court has previously instructed you that it is your duty to determine the facts from evidence received in open court and to apply the law to the facts and in this way decide the case.

I am now asking you to return to the jury room for further deliberations. In your deliberations, you should re-examine the questions submitted with the proper regard and consideration for each other's opinions.

You should listen to each other's arguments with open minds and make every reasonable effort to reach a verdict.

I will give you this written instruction. The deputy at this time, you will need to return and continue to deliberate.

The trial court's instruction was in keeping with Michigan's standard jury instruction to deadlocked juries. M Civ JI 60.20 provides:

The Court has previously instructed you that it is your duty to determine the facts from evidence received in open court and to apply the law to the facts and in this way decide the case. I am now asking you to return to the jury room for further deliberations. In your deliberations you should reexamine the questions submitted with a proper regard and consideration for each other's opinions. You should listen to each other's arguments with open minds and make every reasonable effort to reach a verdict.

[Because it appears you are (at an impasse / in need of assistance), I invite you to list the issues that (divide / confuse) you so that I can see if I can be of some assistance by clarifying or amplifying the final instructions.]

The trial court declined to give the bracketed portion, which is based on MCR 2.513(N)(4):

When it appears that a deliberating jury has reached an impasse, or is otherwise in need of assistance, the court *may* invite the jurors to list the issues that divide or confuse them in the event that the judge can be of assistance in clarifying or amplifying the final instructions. [Emphasis added.]

The "Notes on Use" in the model instruction adds: "The Court *may* then make inquiry of the foreperson regarding the jury's ability to reach a verdict and, if further deliberations appear warranted, may give the instruction and return the jury to the jury room."

Plaintiff fails to recognize that "[a] model jury instruction does not have the force and effect of a court rule." MCR 2.512(D)(1). Moreover, "use of the term "may" instead of the term "shall" indicates discretionary, rather than mandatory, action." *Murphy v Michigan Bell Tel Co*, 447 Mich 93, 100; 523 NW2d 310 (1994). Finally – and most importantly – plaintiff fails to acknowledge that the jury, in fact, successfully reached a verdict within one hour of the trial court's instruction. Therefore, the trial court's failure to ask the foreperson whether further deliberations would be warranted is of no moment.

## IV. MILIA'S OWNERSHIP INTEREST IN THE SURGERY CENTER

Finally, plaintiff raises a number of separate –yet related – issues. Plaintiff argues that the surgery center's informed consent contains false statements of fact and law because the form indicates that the surgeons are independent contractors but the surgery center and its physicians are actually involved in a joint venture. Plaintiff contends that Milia's ownership interest results in the surgery

center being responsible for Milia's decisions. Plaintiff believes that the jury should have been able to decide whether these misrepresentations vitiated Patricia's consent to surgery and that the trial court erred in excluding evidence regarding Milia's ownership interest.

These issues were addressed at hearings on defendants' motion for summary disposition and defendants' motion in limine. A trial court's decision on a motion for summary disposition is reviewed de novo on appeal. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A trial court's decision whether to admit evidence is reviewed for an abuse of discretion. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010).

The informed consent provides:

11. I understand that the physicians providing services to me, including but not limited to, the surgeon, anesthesiologist, radiologist and pathologist are independent contractors with me and are not employees or agents of the Surgery Center or the Hospital. When a patient is under the care and supervision of a physician who is an independent contractor, it is the responsibility of the Surgery Center and its nursing staff to carry out the instructions of such physician. **Neither the Surgery Center nor the Hospital is responsible for the medical decisions or actions of such physicians**. [Emphasis added.]

Plaintiff concedes that Milia is not an employee of the surgery center but claims that Milia is involved in a joint venture and is part owner of the surgery center. Plaintiff argues that, as an owner, Milia's negligence is imputed on to the surgery center. Plaintiff cites MCL 333.20813(a) of the public health code, MCL 333.201 *et seq*:

The owner, operator, and governing body of a freestanding surgical outpatient facility licensed under this article:

(a) Are responsible for all phases of the operation of the facility, selection of medical staff, and quality of care rendered in the facility.

However, as the trial court and defendants aptly note, an identical provision in the public health code applies to hospitals:

The owner, operator, and governing body of a hospital licensed under this article:

(a) Are responsible for all phases of the operation of the hospital, selection of the medical staff, and quality of care rendered in the hospital. [MCL 333.21513(a).]

Our Court has held that § 333.21513(a) does not create a private cause of action. *Fisher v WA Foote Mem Hosp*, 261 Mich App 727, 730; 683 NW2d 248 (2004). There is no reason for surgical centers to be treated differently. Moreover, *Grewe v Mt Clemens Gen Hosp*, 404 Mich 240, 250; 273 NW2d 429 (1978), confirms that hospitals are not vicariously liable for the negligence of a physician who is an independent contractor and uses the hospital to provide treatment unless the patient looked to the hospital to provide medical care. There is no reason to treat surgery centers differently. Moreover, in denying plaintiff's motion for a new trial, the trial court noted: "Plaintiff's arguments that the negligen[ce] of the physicians is imputable to the DSC and other joint ventures is irrelevant where the jury has found no negligence." We agree. Plaintiff's claim that Patricia's consent was vitiated because

of factual and legal misstatements in the informed consent must fail based on counsel's acknowledgement that Milia's ownership interest was, in fact, stated in the patient handbook and at the reception desk. Plaintiff's agency arguments were never pleaded in the trial court and he has not demonstrated how the public health code changes the well-established rule that hospitals are not liable for doctors who use the hospital as a situs for patient care. More importantly, in the face of the jury's verdict of no negligence, vicarious liability has no application.

Affirmed. Defendants may tax costs as the prevailing party. MCR 7.219.


/s/ Christopher M. Murray
/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood